Okay, Mr. Gillardy? May it please the Court. Greg Gillardy of Wilson Gray on behalf of the Appellate, the Official Committee of Unsecured Creditors in the Bouchard Transportation Matters. Your Honors, the very first issue is, I think, an issue of real first impression for this Court, though it has been addressed by the Third Circuit and other circuits, and that's whether the allowance of a breakup fee or expense reimbursement to an unsuccessful bidder, which was not pre-approved, the bidders, is properly assessed under the Administrative Expense Standard, a much more stringent standard, or the Business Judgment Standard. This matters significantly in this case, although we do argue that neither standard was satisfied. Why does it matter? First, who had the burden is determined by which standard. If it is the Administrative Expense Standard, the claimant, Hartree, not the debtor, had the burden, and had the burden to show three elements which are narrowly construed by this the transaction was necessary to preserve the estate. If the Business Judgment Standard applied, then it was the debtor who had the burden, and was there a valid business purpose for giving this. So the first issue is one that this Court has de novo reviewed, and we believe that the facts on de novo review show that 503B is the appropriate standard, and that standard was not satisfied. Let me cite to the record, first, the contemplated bid procedures order that was entered prior to the auction, record site 1033, uses 503B. Second, the actual order that allowed the claim, record site 4496, founded the claim under 503. Third, the Bankruptcy Court said it was about claims allowance, record site 5681, and then we have the legal precedent, not of this jurisdiction, that Section 363, which is the Business Judgment Standard, does not give authority to allow or disallow claims. It allows the debtor to use assets, and, Your Honor, we believe that O'Brien was properly the Third Circuit opinion is the proper standard for assessing it. And what do you do with the Osaka case? Thank you, Your Honor. I was on the panel in that case, and I thought we used 363B. You did exactly, Your Honor, and I think that that case was very well written, and it is actually distinguishable on its facts, and says it is distinguishable on its facts. First, it was the prospective approval of expenses to get to an auction. It wasn't after the fact, after the expenses. And if Your Honor goes to that opinion at page 602, it says 503 generally applies to third parties that have already incurred expenses without prior approval. So that case is distinguishable on its facts. Had the debtors come to the court and said, let's approve for Hartree the expenses, I would not let the debtor do that for a valid business purpose. That's not the facts of this case. These facts are closer to the O'Brien and the Reliant matter. So, Your Honor, we think that's distinguishable and doesn't bind the precedent. Your Honor, now, whether Hartree satisfied, Your Honors, whether they carried the burden on 503 is, again, a mixed question of law and fact. And I think the facts are largely uncontested here. If you read the record, I don't think we have a dispute. The question is whether those facts allow the court to make a 503B determination with respect to the three elements. Again, we say they don't. First, whether there was a post-petition transaction with the debtor. As the district court pointed out, the bankruptcy court really just simply dismissed my argument that there was no such transaction. Again, record site 5671 is where the bankruptcy court dismissed me. So the reviewing court, the first reviewing court, the district court, went and looked at whether we could say there's a transaction here. We believe that the district court's analysis is flawed, even if Your Honors were to consider it. But you can go back to the record and see if there was a transaction. First, the Hartree APA, specifically in section 5.1B, record site 1650, and in section 6.8 of the asset purchase agreement said it was subject to court approval. So there was already a condition that they couldn't have that transaction absent court approval. Second, that deal was never approved. That transaction, that APA, was never approved by the bankruptcy court. We cited to the record where the actual deal, where it was an asset purchase agreement to Hartree, is not approved as a backup bidder. So you didn't have one of the conditions. And the final claims order never approved that transaction. So is that prohibited from being approved post-transaction? It could have been approved post-transaction as a contract, but it was never approved post-transaction. And that was the condition of the bid procedures order. So instead, you had this very mixed, confused situation where they came in and did a claim, the debtor did the evidence. But really, it was Hartree that had to carry its burden, and it didn't do so is what we're saying. So, and what the district court then said is, well, you agreed, the committee agreed to allow the three-day window to essentially, we wait, there's a specific finding of waiver at 6651 in the docket. But there wasn't a waiver. The district court, the bankruptcy court actually said, that was appropriate, what we did. And indeed, if you look through the testimony, testimony from Mr. Mortner and Mr. Bortels, clearly said they never asked us to consent to the break of fee. They knew that there was a three-day limit, and we never waived that. So the district court, one, essentially overruled the bankruptcy court to say there was no waiver. And it misaligned the facts because they could have gone back into court the day before. There was two days of option, you'll see in the transcripts. There was two days of option. They could have asked for an emergency hearing. It shifted the burden to us. They didn't do so. And they bid knowing that there was a risk that that would not be approved. So, Your Honor, we don't think that there's any post-petition transaction that could have been relied on for an allowed claim. Second standard is whether there was actual benefit. Again, it's very important, and this comes up in many of the cases, you will always have a bidder, Your Honor, I've practiced bankruptcy law for 30 years. You'll always have the bidder say, absolutely, I wouldn't bid. But you'll see the cases like Reliant and you'll see O'Brien, where they come in and they say we'd never bid, but then the bankruptcy court doesn't approve it. All of a sudden, they come back and they bid. So it's very important to focus on whether there was an actual and not speculative or potential benefit. First, again, bankruptcy court gave no analysis. The district court said so. Its only analysis was 5681, which says certainly there was a benefit achieved. No factual findings, none. Courts have ruled that when you have an actual benefit, it has to promote competitive bidding or to induce a bidder to investigate the asset. Again, neither of those standards was met here. First of all, no competitive bidding was induced. Again, if you look at the testimony of Mr. Mortner at 5550, he said he never intended it to induce because it was the night before the auction. How were you going to induce the bidding? Second, JMB, the only party that bid, the secured lender, told the debtors that it would bid before the auction commenced at 5543. Three, they concede that the other bidder's center line did not bid and was not induced to bid and it was a potential bidder. That's at record site 5585. And then finally, what people seem to rely on is that, well, just because there was another bid, it must have induced it. That is a bridge too far. O'Brien at page 181F3 at 537 was reviewing the district court's decision there. And the district court said the court was required to show that it served as a catalyst for the bid. So we've been making the argument that there has to be some causal connection between the first bid and the second, but there was no evidence of any causal relationship that the Hartree bid precipitated, caused, was a catalyst for the JMB bid. And that's evident from nobody at JMB testified that it caused it to bid and JMB actually advised that it would bid prior to the auction. So we don't think it induced bidding. What you hear a testimony was, and what the district court focused on, is what they called the naked auction. I thought that the stalking hoards produced a special money increase to pay these fees. Your Honor, there is testimony, and what the district court did rely on was the argument that there was negotiations back and forth and that the debtor... Is it true? Is it true that there were negotiations between... No, my question had to do with the benefits conferred by the stalking hoards. But that didn't... You seek to recover to avoid paying the cost expenses, the breakup fee. Yet I understood from the record, perhaps I'm mistaken, that it resulted in a higher bid for money, and sufficient money to actually pay for the increased expenses of the breakup fees. Your Honor, again, we go back to the O'Brien. Merely because there was an overbid does not mean that the estate actually benefited. And the testimony is actually clear. Both Mr. Mortner and Mr. Bartels testified that the only party that benefited from the overbid was the secured creditor, not the estates in general. And also, you have to show the inducement. It wasn't the catalyst. In order for you to approve a breakup fee... And now we may want to distinguish between breakup fees and expense reimbursements. Excuse me? I should be able to. They should have gotten court approval before they ever went and bid. That's exactly the certainty. And that's exactly what every... Not every other circuit. That's what, for example, the Third Circuit requires. You get approval of your breakup fee and expense reimbursement before you go to the auction. And you can't have a hypothetical approval of a breakup fee and an expense reimbursement because until you show a bidder and you show what the conditions of the bid are, you shouldn't approve a breakup fee or expense reimbursement. Here, what you had was a preliminary, it's okay, but the committee negotiated for three days. The time period got too tight, but there was still time. They could have adjourned the sale hearing. The bidder could have said, I'm not going forward until Judge Jones approves it. They did neither of those. So they went in knowingly and willingly that there was a risk that they might not ever have approval. And if you look at the language in Reliant, as they said at 594 F3rd at 207, the APA reflects mere possibility of payment and is itself not sufficient. That's exactly the situation we have here. It's not sufficient. They took the risk. That they could be overbid. They did so with their eyes open. That's why sophisticated parties get approval before you go through that. You have what we call in bankruptcy, a two-stage process. Bid procedures get approved, breakup fee with the bidder. Then you go to the option. You then have a court order saying they shall get this. They never had that here. Although it contemplated it. If they had sought approval, they hadn't gotten it for the result. If they had not gotten it, they could have walked away and we believe the JMD would have bid. That's exactly why actual benefit has to be actual, not speculative or potential. That's exactly what we were prepared to live. And Your Honor, the record shows the debtor did that with the Wells Fargo collateral. Your Honor, I see my time is running, so I would just like to say two more things very quickly. One, we actually think the bid harmed the debtor's estate. As you will see, the evidence is uncontroverted. That one, the only creditor that benefited was JMD. And had that deal been approved and had it been, it couldn't be closed because it needed JMD's consent and it would have resulted in administrative insolvency. And then finally, we don't think there's a finding to preserve the estate because they actually harmed the estate by 5.3 to $8.1 million. Thank you. Thank you, Mr. Ghilardi. You've saved time for both. Sorry, sorry to not mention that. Mr. Klarman? Thank you, Your Honor. May it please the Court, Billy Klarman from Paul Weiss, Ruffin, Morton & Garrison, LLP on behalf of the Pelle Hartree Partners. The decision to award the bid protections that Hartree bargained for should be affirmed because those protections served their intended purpose. Hartree's stocking horse bid set the floor at the auction for the debtor's assets at $110 million. The stocking horse bid prompted an overbid by JMD Capital that brought additional value to the estate. The auction transcript in this case makes it very clear that the overbid amount that was ultimately bid by JMD, $115.3 million, was calculated precisely to account for the minimum bid plus $3.3 million of breakup fee, $1.5 million of potential expense reimbursement, and $500,000 of the overbid. The record is also clear that the bid protections were necessary to induce Hartree's participation initially and then continue to serve as the backup bidder after JMD was successful in the auction. And I heard Mr. Gillory argue that the question, the first question here is whether or not the business judgment rule applies or the administrative expense standard applies. I think that is an interesting question, but it is not determinative in this case because the bid protections here should be approved and affirmed under either standard.  Judge Rosenthal in the district court, so found. Reached the same conclusion following a lengthy analysis. You don't think it would be helpful though for us going forward to announce what the standard is in this court? I think that would be helpful certainly to parties, Your Honor. And I do submit that under this court's decision in the SARCO, the business judgment rule should apply on the facts of this case. Here, the debtors did receive, did go to the bankruptcy court and sought and obtained pre-auction authorization to offer bid protections in the form of a break fee within specified parameters, a break fee of up to 3% and an expense reimbursement subject to a cap. That was not objected to by the creditors committee. There was, of course, an opportunity for parties to object upon filing of a stocking horse notice. But here in this case, at the time the auction was conducted and it was a 363 auction, Mr. Ghilardi mentioned that the bid procedures order invoked section 503. It also invoked section 363. This was a sale that was approved in the ultimate sale to JMD was approved pursuant to 363. But at the time of the auction, the parties had in hand Judge Jones's order, which authorized bid protections precisely in the form as they existed in the stocking horse agreement. There had not been an objection prior to the auction. The purpose or rather what section 363 of the bankruptcy code allows is for the debtors to use property outside of the ordinary course of business in their business judgment. That's what happened here. The use was made at the auction. These bid protections were actually a part of the auction. They were accounted for in JMD's overbid. And for that reason, I'd submit that the business judgment rule should apply. This is not like the cases of Reliant and O'Brien, the third circuit cases that we've heard a lot about.  to the bankruptcy court before the auction and the court expressed concern that the bid protections sought would chill bidding and so reach the conclusion that the debtor should not be permitted to use estate property in that fashion. Here, unlike in those cases, there was express authorization and the language of the bid procedures order is clear is that the debtor was authorized to offer these forms of bid protections in its business judgment and that's what they did. But tell us how you theorize that you can win under 503B should we decide that that's the governing standard. Certainly are. There are essentially two criteria. The first is there must be a post-petition transaction of business with the debtor. The second is that the expenses must be actual necessary costs to preserve the estate. The first standard is the post-petition transaction standard. Mr. Ghilardi tells us there was none. Yeah, I think Mr. Ghilardi is creative in his argument in that regard and I say this for the following reason. Here, there was a signed APN between Hartree and the debtors. Hartree showed up and bid at the auction. Hartree was announced as the end. There was reliance on all parties on the provisions of the APA at the auction. There was that is explicitly in the auction transcript. You can see this how the overbid was calculated. Hartree Partners served as the backup bidder that was required and that was self-executing under the court's bid procedures order in section 13 of the bid procedures. The record is clear that the debtors intended to enforce that obligation against Hartree. JMB had not been on the scene before the auction. We heard testimony that there was an expectation on the part of the debtors that JMB would bid. That is absolutely not the case. The debtors were first notified that JMB would bid after the notice was posted on the docket of the stock reverse bid. So, Hartree Partners placed its good faith deposit of $11 million as it was required to do and it remained the backup bidder for the entire time that the debtors were negotiating the APA with JMB. So, I refer the court to this court's decision in Whistler Energy 2 that 931 F3rd 432. I think Whistler Energy makes clear that the purpose of this transaction of business standard is to simply differentiate pre-petition versus post-petition transactions. In that case, there was no contract. There was simply performance on both sides. So, here the bid procedures were, of course, ultimately approved. So, there was no obstacle, in fact, to enforcement of the agreement. I think that that is, I think the case law amply supports the first factor, the first criteria on the 503B test and I would also refer the court to In re O'Brien, Third Circuit case 181 F3rd 527. In that case, the court, quote, assumed that bidding at the auction was sufficient to satisfy the transaction of business test. With respect to the second element under the 503B test, the claim must reflect actual necessary costs and expenses of preserving the estate and I think the cases show, this is laid out in the In re Energy Future Holdings Corp case 904 F3rd 298. Three types of benefits that courts look to typically to identify potential benefits to the estate that can be associated with bid protections. One is assuring a more competitive auction, more competitive bidding, inducing a bid that otherwise would not have been made and without which bidding would be limited. Here, as I said earlier, JMB explicitly showed up at the auction, bid the overbid exactly to the dollar, the amount that was required consistent with the bid protections in the Hartree APA. It had not previously indicated that it would bid for these assets until after Hartree's stocking horse bid was posted. It induced Hartree a second way that courts recognize a benefit can be given to the estate as if a bidder here Hartree is induced to research the value of the debtor's assets and convert that value to a dollar figure on which other parties can rely. That also happened here. The record is clear that Hartree invested substantial time and resources negotiating, diligencing and going back and forth with the debtors on price. The initial bid that Hartree offered was $105 million. That was negotiated up by the debtors over the course of the week leading up to the posting of the final agreement. And so that benefit too was achieved here. The third benefit is assuring that a bidder will adhere to its bid and honor its obligations. Show up at the auction. That happened here. There was a floor set at the auction. Hartree was held to that floor. There was testimony before the bankruptcy court that one of the reasons that the Hartree did not bid again was because the markets that particular day were roiled by challenges in the oil market. There's no assurance that Hartree would have shown up and bid anything, certainly not $110 million when it started at $105 million earlier in the week. So each of these benefits I submit were achieved here, which is why I believe that the bid protections here should be affirmed regardless of the test that is used. I'd also refer the court... I mean, Mr. Ghilardi's brief says JMB had every incentive to submit a bid and the precise amount it submitted regardless of whether the Hartree bid was submitted. There is no support whatsoever for that in the record. And I don't frankly understand the argument. JMB is a dip lender. It could have shown up and bid less than the full amount of its dip claims. It's not required to bid any particular amount, let alone show up at an auction and bid the entire amount of its credit bid, $95 million, and put $20 million of cash on top of that at the table. There could have been a foreclosure had the auction failed and it could have resulted in a significantly worse outcome for the debtors. So I think the argument that JMB was incentivized to show up at the auction and put $20 million more into the debtors' estate beyond what it had already put into the debtors' estate is simply not supported by any of the testimony that appears in the record and frankly does not, I submit, doesn't even comport with common sense because if you're in JMB's position, if you credit bid, if you have a deficiency claim, you have an additional chip to negotiate with the debtor when you were negotiating the asset purchase agreement. You'd be able to waive the deficiency claim to get concessions potentially in the negotiations under the APA. So I don't believe that there's any support in the actual testimony or record for that contention. I'd also observe that under the EFH case, Energy Future Holdings, third circuit case, that lays out, as I was just describing, the bases on which courts have found a benefit to the estate, the court also observed that it's ultimately within a bankruptcy court's discretion to approve or deny a termination fee based on the totality of the circumstances of the particular case and exercising that discretion, taking into account all the relevant circumstances, the bankruptcy court must make fundamentally a judgment call about whether a benefit was achieved that outweighs whatever potential harm there is to the estate for payment of these additional amounts. And that's exactly what happened here. Judge Jones oversaw, presided over, a very challenging bankruptcy case, a case in which there was a concern of potential administrative insolvency. That outcome was avoided. Part of avoiding that outcome was the successful auction that was supported by the stocking horse bid that Hartree provided, and that judgment should be affirmed. What's the status of the bankruptcy now? The, well, perhaps Mr. Hicks for the debtors could address that question, but the plan was confirmed and the debtors emerged. They were not administratively insolvent, but otherwise I'm not involved in the case there today. Moving on to briefly just touching on the business judgment standard, I think the SARCO lays out how that question should be analyzed. There must be a sound business justification for the bid protections. That was certainly met here. The debtors were clear that they wanted to avoid a naked auction. The only, oh, I should add, they had a naked auction the same day as the sale for the dip collateral, the auction for the dip collateral. That did result in a substantial deficiency claim, and so the dangers were not only well-known to the debtors, but they were borne out by their other experience, and the only other alternative was unactionable because it was a plan of an organization that lacked committed financing. There's certainly no evidence of any self-dealing and manipulation by any party here, and so for all those reasons, I submit that under either standard, the ruling below should be affirmed. All right, thank you, Your Honor. Chairman. Thank you. Hicks. Thank you, Your Honor, and may it please the Court, George Hicks for the Appellee Bouchard Transportation Company, the debtor in this case. Very quickly, Judge Engelhardt, to your question. The status of the bankruptcy is that planning has been confirmed. Distributions have yet to take place because there's been some litigation between one of the former officers, Mr. Bouchard, and that is actually being worked out right now, so there will be distributions very soon, but with respect to this particular case, the debtors, we join in Hartree's arguments, and I'm here just to briefly address the committee's arguments that the debtors' board violated the business judgment standard in approving the bid protections and selecting Hartree. The debtors' board satisfied the flexible business judgment standard. I would refer you to pages 32 to 35 of the district court's opinion where the district court exhaustively and methodically walks through the record, the second court to do so, explaining how the business judgment of the board was exercised reasonably and followed the right process. There's been no self-dealing or manipulation alleged. The bid protections did encourage competitive bidding for the reasons Mr. Clareman noted, but also that are well borne out by the record. There was a very distinct possibility of a naked auction with no bids, and the record shows that there actually had been in the same bankruptcy a prior naked auction that was a bust, and nobody wanted to go through that again or even have the risk of it. It's not just the certainty of it, but just merely the risk of it, and so given that, the board was certainly acting within its business judgments to have the bid protections that would include encouraging a stalking horse bidder. As far as selecting Hartree as the stalking horse bidder, again, the record is very clear that the board's decision was reasonable and followed sufficient process. On July 15th, it was first informed of Hartree's interest. July 16th, the board got a proposal and it discussed the pros and cons. July 17th, another board meeting, more discussion. July 18th, two board meetings, a presentation on Hartree's bid and the board's discussion and then decision to approve Hartree, and the record is clear that this wasn't just sort of empty formalism. They were considering another approach, which was, I believe, the centerline approach, and it was determined in their business judgment that there was not sufficient financing and that there was, again, a risk. It didn't have to be a certainty, but a risk that that would not go through, which would have real negative effects on the proceedings. So the decision to select Hartree certainly satisfied the flexible business judgment standard. The committee's arguments with respect to the business judgment standard, I just simply think, are not supported by the record and even if true, frankly, for lack of a better word, are sort of nitpicking when it comes to the business judgment standard. It's a very flexible standard. It's a relatively low bar, and I think it's important to note that two separate courts have already looked at that particular question, in addition to the other questions in this case, and found that the board satisfied the business judgment standard, and I think that when we're talking about the application of a standard to the facts of this case, which are somewhat complex, whether you're talking about the business judgment standard or even the administrative expense standard, I think the fact that two other courts have already methodically and thoroughly reviewed this and issued opinions that have walked through the record, I think speaks volumes, especially when I think... Mr. Tom has expired now. Yes, thank you, Your Honor. Mr. Calardi for the vote. Thank you, Your Honor. I will be extremely quick. First, the Hartrees did not establish a floor. The fact the floor was baseless because, one, that deal could not be approved without the consent of JMB, as the record shows, and there was no consent of JMB. Two, that floor established that at least five of the debtors would be administratively insolvent. That also goes to the business judgment standard, but I'm not going to spend too much time on that. That deal could not be consummated without JMB's consent. The debtors never even sought JMB's consent. So to speak of a floor, very much like EFH, there was a condition subsequently that was not satisfied, could not be satisfied. Second, the appellant said that the overbid, quote, prompted. There is no evidence that that bid prompted JMB to bid. The record is very clear that Mr. Mortoner said it didn't induce any bids and that JMB came to the auction, traveled the night before the stock, during the day the stocking horse bid was announced to bid and advised them that it was bid. So while there was another bid, I don't believe you can find that there was a catalyst and there was nothing in the record that said it caused, prompted, or otherwise. Third, Mr. Clerman said that they served as a backup. The specific sale order says they were not approved as a backup bidder. That was put into the JMB bid. There was never an approval of the agreement. Fourth, the 503B standard, I don't understand why it's not law of the case here. Record site 1033, the bid procedures order, yes, the debtors had to sell pursuant to 363, but the approval of the breakup fee had to be by 503B after a bidder was identified. That's at 1033 and 4496. Their own order says they were approved under 503B as a claim. Next, the transaction. Yes, transactions often are between pre-petition and post-petition, but your honor, it would prove too much if a bidder had a deal with a debtor, got a debtor deal to do a breakup fee, just went to an auction, and then eventually asked for the breakup fee. The requirement, as noticed and notified in O'Brien and is the law, in order for that agreement to be enforceable, it has to be approved by the court. The debtor could walk away at any time. So it's not sufficient simply to have had a meeting, even a signed APA to be a post-petition transaction. That agreement had to be approved. And as I cited before, section 6.8 and 5.1 required that approval. So we get now to the competition, the inducing JMB to bid and induce Hartree to do substantial due diligence. One, there was no competition. And in fact, the testimony is clear if you read Mr. Morgan, he didn't expect anybody to be bidding, you know, induce competition when that bid was announced at 10 p.m. on a Sunday evening and the auction was Monday. Two, there's no evidence that JMB was induced to bid. And Your Honor read my quote from that language, as we've explained, and if you read the testimony of Mr. Morgan and you look at what a deficiency claim would have paid them, it would have paid them zero. The Wells Fargo auction had just concluded there was no value, there was no money in the estate, everything was tested. So I would say in the record, there's plenty of testimony that the only thing people were relying on is the surcharge claim against Wells, which was a hope note. So JMB had every reason to bid because it would have had an administrative claim, it might not get paid. So therefore, it was going to bid that exact amount. And if you look at the presentation to the board and the testimony of Mr. Mortner, he laid out that they had to pay maritime fees, professional fees, they would have had a deficiency claim. So they had to bid just that amount. So to take in the ordinary case, sure, you get a deficiency claim, but you wouldn't have gotten money. So at the end of the day, we believe that 503B is the appropriate standard, that this fails on all three of the elements, but all it needs to do is fail on one. We believe this court can reverse the remand to disallow the breakup fee. And on the business judgment standard, what we will say is simply because the debtors the debtors board looked at the transaction, you will see that it made a decision that was detrimental to the charter debtors. That's a violation of business judgment because the charter debtors would have been administratively insolvent. Two, it made a decision that there wasn't a that had to have a condition subsequent, never told them to get the condition subsequent satisfied JMB consent. So we would therefore say that although they did a lot of reasoning, they did the best they could under the circumstance. There was a failure of business judgment as well. Thank you. All right. Thank you, Mr. McClarty. Your case is under submission and as previously announced, the court will take a brief recess before hearing the final two cases.